NOT DESIGNATED FOR PUBLICATION

No. 125,943

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

DYLAN R. CORYELL,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*,

MEMORANDUM OPINION

Appeal from Decatur District Court; PRESTON PRATT, judge. Submitted without oral argument. Opinion filed May 3, 2024. Affirmed.

*Korey A. Kaul*, of Kansas Appellate Defender Office, for appellant.

*Ryan J. Ott*, assistant solicitor general, and *Kris W. Kobach*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., MALONE and WARNER, JJ.

PER CURIAM: Dylan R. Coryell filed a K.S.A. 60-1507 motion, arguing he was entitled to a new trial based on newly discovered evidence. This court agreed and remanded for an evidentiary hearing to determine the credibility of a witness who claimed to have overheard another person confess to Coryell's crime of conviction. After holding an evidentiary hearing, the district court found the witness was not credible. The court concluded that the witness' testimony did not raise a reasonable probability of acquittal upon a retrial. Coryell now appeals that determination. After a thorough review of the record, we find that the district court did not abuse its discretion in denying Coryell's motion.

1

A jury convicted Coryell of second-degree intentional murder and aggravated battery in March 2013 after a shooting in 2011 that resulted in Corey Cook's death and injuries to Sarah Campbell, who was dating both Coryell and Cook at the time. A detailed recitation of the facts can be found in this court's decision on direct appeal. *State v. Coryell*, No. 110,542, 2016 WL 757568 (Kan. App. 2016) (unpublished opinion) (*Coryell I*).

Suffice it to say for purposes of this appeal, that Coryell, Everett Urban, and Killian Dellere were present at the time of the shooting. Urban and Dellere identified Coryell as the shooter, but all three alluded to it being accidental. Coryell told police that someone tossed him the gun and it accidentally discharged when he caught it— "'a freak accident.'" 2016 WL 757568, at *3. But Coryell's defense also centered on the fact that he was extremely intoxicated at the time and could have been convinced by others that he pulled the trigger. *Coryell v. State* , No. 122,104, 2021 WL 2021201, at *8 (Kan. App. 2021) (unpublished opinion) (*Coryell II*). According to Urban, he and Coryell argued outside the bedroom about waking Cook and Campbell (who were in bed together when the three arrived on the scene) before Urban left. As he left, he turned and saw Coryell holding the gun and aiming it into the bedroom. Urban said he kept walking toward the front door but then he heard a gunshot, after which Coryell ran outside the house. But another witness testified that Urban told him he was "'right beside'" Coryell when he fired the shot. *Coryell I*, 2016 WL 757568, at *2.

Several years after his conviction in March 2013, Coryell filed a K.S.A. 60-1507 arguing that newly discovered evidence entitled him to a new trial.

The newly discovered evidence claim stemmed from a letter written by Gatlin Beachel, on May 6, 2016. He claimed to have overheard Urban bragging that *he* fired the

weapon that killed Cook and "got away with it because he was related to the sheriff." This court remanded the case for an evidentiary hearing on the claim. *Coryell II*, 2021 WL 2021201, at *9.

On remand, the district court heard testimony from two witnesses: Beachel and KBI Senior Special Agent Mark Kendrick, who interviewed Beachel. The State also submitted a copy of Beachel's letter and an audio recording of Beachel's interview for the court's consideration.

In the handwritten letter, which prompted the hearing to begin with, Beachel wrote:

1. Sometime between August 2013-2014 he heard a conversation between Urban and Dalton Paul while the three of them were in the Decatur County Jail.

2. Urban stated that "it all started about them fighting over [Urban's] girl sleeping around on him and [then] he said that he got mad and went to [where] she was and when he got to the house that as soon as you come in the door to the right there was a shotgun and he grabbed it and went to the bedroom and pointed the gun and it did not go off so he went and put it back and saw another gun behind the door of the bedroom and said that he pulled the trigger and shot him Mr. Cook."

3. Urban was bragging about getting away with it "because he was related to the sheriff" and "the people that was on [Coryell's] side got [threatened] that if they said anything that they would go to jail."

4. A man named "Richard Kerpatrick[*sic*]"—who was also present during the conversation and worked with Urban—said that Urban "alway[s] talk[ed] about this."

Appearing by Zoom from prison for the evidentiary hearing, Beachel testified:

1. He told Coryell's attorney that he overheard a conversation between Kirkpatrick, Urban, and an unidentified third man. Beachel stated he "thought it was Dalton Paul" but he "can't really remember."

2. Prior to overhearing the conversation, Beachel was unaware of Coryell's case.

3. Beachel was walking around the cells doing "laps" and going in and out of the room during the conversation.

4. He overheard Urban and Kirkpatrick talking about Coryell. Beachel heard Urban mention details of Coryell's case, including "where the gun was, and—what how the crime scene took place, what was in the crime scene, like, the gun that dude—that [Coryell] supposedly shot dude with was a .410, and the first one hid behind the front door of the house."

5. He heard Urban say that Urban and Coryell were hanging out and Coryell was texting a woman whose boyfriend had recently returned from a military deployment. The boyfriend sent some hostile text messages and had agreed to meet up with Urban and Coryell. When the boyfriend did not show up, they went to a party at his house and "[Coryell] supposedly . . . went into the house and went into the room and shot him."

4

6. He heard Kirkpatrick say, "'Man, the dude didn't even do it? Did dude even do it?'" Urban then stated "'Nah, . . . I got away with it because I'm related to the sheriff.'"

7. Beachel remembered a later interview with Agent Kendrick. He could not recall stating anything differently during the interview than what he included in the statement. Beachel also recalled speaking with a private investigator. Beachel told the private investigator he could not verify if Urban's statements were true, just that he overheard Urban making the statements.

8. Beachel denied telling Agent Kendrick that he suffered from a traumatic brain injury but acknowledged telling him that he has trouble communicating with people and understanding what people mean.

9. Beachel acknowledged telling Agent Kendrick that Dalton Paul was present during the conversation yet admitted that jail records showed Paul was not in the jail at the same time as Beachel.

Agent Kendrick testified in person and through the recorded interview that the court reviewed.

1. Dalton Paul was not in the Decatur County Jail at the same time as Beachel and Everett. But Beachel and Urban were both there during the time frame this conversation allegedly took place.

2. Dalton Paul denied hearing anything about the case.

3. Kendrick interviewed Beachel on April 5, 2022—roughly six years after Beachel wrote the letter.

5

4. Beachel changed his story multiple times during their conversation.

   a. At first, Beachel said he stood by the contents of his letter "as far as I can remember," but acknowledged he wrote the letter "a long time ago."

   b. After reviewing the letter, Beachel said he "can't say that it's true because it's word of mouth from somebody else and I was just saying that's what I heard when I was in there."

   c. Beachel believed it was Dalton Paul speaking, then said the letter "ain't correct" once he realized the letter stated it was Urban.

   d. Beachel could not remember if Urban ever stated he killed someone.

   e. Beachel told Coryell's attorney that he did not want to testify "whatsoever" and did not believe his written statement would be used as an affidavit. He said he never swore to any of it.

   f. Beachel was "positive" that he had been in jail at the same time as Paul, despite jail records showing he was not. When Agent Kendrick told Beachel he was in jail with Urban, Beachel denied that being true. He said he was never in jail with Urban, at all.

   g. When confronted with the fact that he was never in jail with Urban and Paul at the same time, Beachel said he may have "got the wrong people mixed up," and he denied knowing Urban at all or may have misremembered knowing him. Beachel said that "more than likely" it was a mistake and that he told Coryell's attorney that he could not remember very well. He was just telling the attorney "what I heard."

6

h. Beachel denied knowing any details about the case, including that he did not know Cook was the person who had been killed. Beachel "just got told a story" and could not remember who told that story.

i. Beachel stated he "suffered from traumatic brain injury" and had a "hard time remembering."

j. Beachel acknowledged that his story on the letter did not add up "as far as the names." He reiterated that he would not have written the letter if he knew it would be used in court.

k. Beachel said he "did get told" the story but could not remember "by who" and could not say whether it was true.

l. Beachel said he might have gotten the people mixed up and he would not be willing to swear to what he wrote.

The district court denied Coryell's motion, finding that "Beachel is not credible nor would his testimony raise a reasonable probability of acquittal upon retrial." After recounting the procedural history and the testimony elicited at trial, the court explained:

"Beachel has heard something from someone because he does know the details of the crime. Urban was a witness and was present at the crime scene. Beachel was in county jail at the same time as Urban so it is reasonable to infer that Beachel obtained his knowledge of the incident because he heard Urban talking about it. The important part of the conversation, however, is Urban saying he is the one who shot Cook and got away with it. The Court finds Beachel, who was not involved in the conversation, who was walking around the jail during the conversation, who was not always in the same room as the people having the conversation, who first said Urban was talking to Paul, then said Paul was doing the talking, then said Urban was talking to Kerpatrick, and who has a hard time remembering, communicating, and understanding what people mean, *is not*

7

*worthy of belief*, nor would Beachel's testimony raise a reasonable probability of acquittal upon retrial because the overwhelming trial evidence was that Coryell shot and killed Cook." (Emphasis added.)

Coryell timely appealed.

ANALYSIS

Coryell challenges the district court's decision denying his K.S.A. 60-1507 motion based on newly discovered evidence, arguing the court erred in finding that Beachel's testimony lacked credibility and did not raise a reasonable probability of an acquittal upon retrial. We begin with our standard of review.

*We review the district court's decision for an abuse of discretion.*

Coryell's appeal originates from the denial of a K.S.A. 60-1507 motion after an evidentiary hearing. Here, we

"must determine whether the district court's factual findings are supported by substantial competent evidence and whether those findings are sufficient to support the district court's conclusions of law. Ultimately, the district court's conclusions of law and its decision to grant or deny the 60-1507 motion are reviewed using a de novo standard. [Citations omitted.]" *Bellamy v. State*, 285 Kan. 346, 355, 172 P.3d 10 (2007).

Yet this court treated his claim of newly discovered evidence as a motion for new trial because that is how the district court framed it when originally denying the motion. *Coryell II*, 2021 WL 2021201, at *6-7. And Coryell also recognizes that appellate courts typically review an order denying a motion for new trial based on newly discovered evidence for an abuse of discretion. *State v. Ashley*, 306 Kan. 642, 650, 396 P.3d 92 (2017); see also *Moncla v. State*, 285 Kan. 826, 839-40, 176 P.3d 954 (2008) (reviewing

8

summary denial of claim of newly discovered evidence for an abuse of discretion, despite being raised in the context of a K.S.A. 60-1507 proceeding). We agree.

A district court abuses its discretion when its decision is (1) arbitrary, fanciful, or unreasonable; (2) based on a legal error; or (3) based on a factual error. *State v. Levy*, 313 Kan. 232, 237, 485 P.3d 605 (2021). As the party asserting an abuse of discretion, Coryell bears the burden of showing the abuse occurred. See *State v. Crosby*, 312 Kan. 630, 635, 479 P.3d 167 (2021).

*Appellate courts will not reassess witness credibility.*

As the starting point for his analysis, Coryell urges this court to disregard the longstanding rule that appellate courts will not reassess witness credibility. He points out that this rule arises because of "the district court's ability, as the factfinder, 'to observe the witnesses and evaluate their demeanor,'" which means appellate courts are not afforded the opportunity to "effectively review the district court's decision." Thus, citing to the Kansas Supreme Court's decision in *Moncla*, Coryell asserts "this Court has the ability, and the obligation," to review whether the district court's credibility determination is arbitrary or arises from a mistake of fact or law.

But the portion of the *Moncla* decision he cites only discusses the standard of review, not that an appellate court can reweigh a district court's credibility determination. In fact, our court then concluded that the district court in the case abused its discretion by not holding an evidentiary hearing on Moncla's newly discovered evidence claim specifically because "the witnesses through whom Moncla claims his innocence may be proven have not been evaluated by the district court." 285 Kan. at 840. In other words, no credibility findings had been made yet for the Kansas Supreme Court to review. But once the case returned to the district court for an evidentiary hearing, the district court again denied Moncla's motion because it found the only testifying witness who corroborated his

9

claim of newly discovered evidence lacked credibility, which this court then declined to reassess on appeal. *Moncla v. State*, No. 101,979, 2010 WL 2978032, at *3 (Kan. App. 2010) (unpublished opinion).

*The district court did not abuse its discretion.*

Coryell's newly discovered evidence claim is much like the one ultimately rejected in *Moncla*, in that both were based on testimony from witnesses who allegedly overheard a conversation in which another person confessed to the murder for which the defendant had been convicted. This court determined that the district court did not abuse its discretion because of the circumstances in which the witnesses claimed to have overheard the conversation. Like here, when it came time to testify, many of the witnesses either did not appear, denied they had ever told Moncla that someone else had confessed the crime to him, or could not hear the whole conversation, or could not remember. 2010 WL 2978032, at *1-2.

Likewise, we find no abuse of discretion by the district court here in denying Coryell's motion based on Beachel's lack of credibility and the surrounding circumstances of the conversation he allegedly overheard. Although Beachel insisted in his testimony that he heard Everett admit firing the shot that killed Cook, his statements during the recorded interview paint a different picture. Beachel struggled to remember who was even present during the alleged conversation. And despite denying it at the hearing, Beachel told Agent Kendrick during the interview that he suffered from a traumatic brain injury that affected his memory.

Coryell also asserts the district court's credibility determination is arbitrary because the court failed to offer a specific reason, such as Beachel being biased in Coryell's favor or observations about his demeanor when testifying. But those reasons are precisely why appellate courts give great deference to the district court's credibility

findings, since district courts are in the best position to judge credibility. Moreover, Beachel repeatedly stated during the interview that he would not have written the letter if he knew it would be used as a sworn statement and that he did not want to have to testify. That evidence tends to support the district court's credibility determination because it places all his testimony about the conversation he allegedly overheard in doubt.

For his second ground of attack, Coryell asserts the district court made a mistake of fact because this court already determined in *Coryell II* that there was not overwhelming evidence to support Coryell's conviction. Coryell's reading of this court's prior decision is not accurate. As the State correctly notes, this court merely concluded that evaluating Coryell's newly discovered evidence claim necessarily required a full evaluation of Beachel's credibility, which was not done because the district court summarily denied the claim without an evidentiary hearing. *Coryell II*, 2021 WL 2021201, at *8.

"[N]ewly discovered evidence that merely tends to impeach or discredit the testimony of a witness is ordinarily not grounds for granting a new trial. *State v. Richard*, 235 Kan. 355, 363, 681 P.2d 612 (1984); *State v. Foy*, 224 Kan. 558, 569, 582 P.2d 281 (1978)." *State v. Ashley*, 306 Kan. 642, 650, 396 P.3d 92 (2017). And "[e]ven when the evidence tends to impeach the testimony of a witness, the presence or absence of corroborating evidence is an additional factor to consider in determining whether newly discovered evidence is so material that it is likely to produce a different result upon retrial." 306 Kan. at 650. Put simply, there is no longer any possibility that Beachel's testimony could exonerate Coryell because Beachel provides no corroborating evidence for Beachel's testimony and, even if he had, Beachel's testimony lacked credibility and materiality and was of limited value. See *State v. Warren*, 302 Kan. 601, 616, 356 P.3d 396 (2015) ("'Zero credibility means zero materiality and zero chance that the outcome of a retrial would be different.'" Quoting *State v. Laurel*, 299 Kan. 668, 676-77, 325 P.3d 1154 [2014]).

11

In sum, we find the district court did not abuse its discretion in denying Coryell's K.S.A. 60-1507 motion.

Affirmed.